## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| TAMMIE and WALTER McGAUTHA, on behalf of themselves and all others similarly situated, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. _____ |
| FORD MOTOR COMPANY, | ) ) | **Demand for Jury Trial** |
| Defendant. | ) ) | |

## COMPLAINT

Plaintiffs Tammie and Walter McGautha, on behalf of themselves and all others similarly situated, allege as follows against Ford Motor Company (Ford):

1.     Ford designs, markets, and sells several vehicles containing the Ford 1.0L EcoBoost engine. The EcoBoost engine is a one liter, 3-cylinder engine used in various economy and compact Ford vehicles.

2.     Specifically, Ford manufactured and sold the following vehicles with the EcoBoost engine:

     a.   2016-2017 Ford Fiesta;

     b.   2018-2021 Ford EcoSport; and

     c.   2016-2018 Ford Focus (collectively Class Vehicles).

3.     Each of the Class Vehicles has a defective oil pump that causes catastrophic engine failure while Class Vehicles are in use—an inherently dangerous condition that Ford knew or should have known about.

4.     The oil pump defect is a design defect that is inherent in every Class Vehicle. The defect leads to a loss of oil pressure and an oil pump failure, causing the oil in the vehicle to slow

or stop circulating, increasing engine temperature beyond specifications, and subsequently causing the engine to seize up and fail. It is the product of two related problems: (1) defective engine oil pump tensioners, which are prone to premature failure and do not meet industry standards, and (2) Ford's use of insufficiently robust materials for the belts, which also do not meet industry standards.

5. The oil pump defect can cause the engine to stall or fail without warning or cause the vehicle to decelerate or stop suddenly. In this respect, the defect poses a serious safety risk to drivers of the Class Vehicles, as well as other drivers who share the road with Class Vehicles.

6. Plaintiffs bring this case to obtain relief for her and other members of the proposed Class.

## JURISDICTION AND VENUE

7. This Court has subject matter jurisdiction under 28 U.S.C. §1332(d)(2), because the Class defined herein contains more than 100 persons, the aggregate amount in controversy exceeds $5,000,000, and at least one member of the Class is a citizen of a State different from Defendant. Subject matter jurisdiction over this action also exists under 15 U.S.C. § 4 and under 28 U.S.C. §§ 1331, 1337.

8. This Court has personal jurisdiction over Ford. Ford has: (1) transacted substantial business in the United States, including in this District; (2) transacted business with members of the Class throughout the United States, including in this District; and (3) had substantial contacts with the United States, including in this District.

9. Moreover, Ford has a significant manufacturing presence within this District. Ford operates an assembly plant in Claycomo, Missouri (known as the "Kansas City Assembly Plant") where Ford employs over 9,400 employees.

10. Venue is proper in this District under 15 U.S.C. § 22 and under 28 U.S.C. §1391(b), (c), and (d). Ford transacted business, was found, had agents and/or resided in this District; a substantial part of the events giving rise to Plaintiffs' claims arose in this District; and a substantial portion of the affected interstate trade and commerce described herein has been carried out in this District.

## PARTIES

11. Plaintiffs Tammie and Walter McGautha are a married couple. They are citizens and residents of Missouri; they reside in Blue Springs, Missouri.

12. Ford is incorporated in Delaware and maintains its principal place of business in Michigan. Ford designs, manufactures, markets, and distributes Class Vehicles.

13. Ford is responsible for marketing materials related to the Class Vehicles, including advertising content, operator manuals, warranty booklets, maintenance schedules, Moroney Stickers, and other promotional materials.

## FACTUAL ALLEGATIONS

**Plaintiffs' Defective EcoSport Vehicle**

14. Plaintiffs own a 2020 Ford EcoSport SE.

15. Plaintiffs purchased their EcoSport on January 21, 2021. They purchased the vehicle for personal and household purposes.

16. At the time of their purchase, Plaintiffs' EcoSport had approximately 20,000 miles on it, and it was approximately one year old.

17. Plaintiffs purchased their EcoSport from Blue Springs Ford, located at 3200 NW South Outer Road in Blue Springs, Missouri.

18.     Between January 2021 and March 2023, Plaintiffs conducted regular maintenance on their vehicle, including regular oil changes.

19.     In March 2023, Plaintiffs were driving to Nashville, Tennessee in their Ford EcoSport. Approximately one hour outside Nashville, Plaintiffs' oil light indicator activated on the EcoSport's dashboard.

20.     Shortly thereafter the EcoSport shuddered and stopped operating on the interstate. Fortunately, Plaintiffs were able to safely navigate the vehicle to the side of the road.

21.     At this time, Plaintiffs' vehicle had approximately 98,000 miles on it.

22.     The vehicle was towed to Tracy Langston Ford in Springfield, Tennessee.

23.     Upon inspection, Tracy Langston Ford told Plaintiffs that their EcoSport oil pump had failed and destroyed the vehicle's engine. Tracy Langston Ford told Plaintiffs that the dealership has "seen this happen so many times."

24.     In June 2023, Tracy Langston Ford provided Plaintiffs an estimate to repair her vehicle, specifically to repair and replace the "long block."

25.     The estimate was for $7,254.01, which consisted of over $3,300 in labor and $3,100 in parts and supplies.

26.     Plaintiffs' vehicle was not repaired until October 2023.

27.     From March to October 2023—approximately six months—Plaintiffs did not enjoy the use of their vehicle. During this time, Plaintiffs (1) continued to make installment payments and insurance coverage payments for the EcoSport, and (2) were inconvenienced by the vehicle's absence.

28.     In October 2023, Plaintiffs paid Tracy Langston Ford $8,181.08 to repair their vehicle.

29.     In late October 2023, Plaintiff Walter McGautha (at Plaintiffs' expense) flew to Springfield, Tennessee; retrieved the EcoSport vehicle; and drove the vehicle back to Blue Springs, Missouri.

30.     Before paying for the repairs and recovering the vehicle, Plaintiffs asked Tracy Langston Ford about trading in the EcoSport for another Ford model. Tracy Langston Ford told Plaintiff Tammie McGautha that the EcoSport had "no value" because of the defect and related damage to the vehicle; thus, the dealership would not consider the EcoSport for a trade in or buy-back purchase.

31.     Plaintiff Tammie McGautha complained to Blue Springs Ford and Ford Motor Company.

32.     In April 2023, shortly after the EcoBoost's failure, Blue Springs Ford told Plaintiff Tammie McGautha that she was not eligible for any assistance because Plaintiffs did not purchase an extended warranty on the vehicle. Blue Springs Ford told Plaintiffs to contact Ford Motor Company.

33.     Plaintiff Tammie McGautha contacted Ford Motor Company, but the company also did not provide any assistance. Plaintiff Tammie McGautha spoke with Kerry Finch at Ford Motor Company; Ms. Finch provided Plaintiff Tammie McGautha with case number CAS 41873142. Ford Motor Company did not provide any further assistance.[1]

34.     Thus, Plaintiffs suffered over $8,000 in damages related to the defective oil pump filter in their EcoSport. This damages amount is under-inclusive because it does not include (1) the approximately six months of use that Plaintiffs missed with their vehicle, and (2) the travel costs associated with flying to Tennessee and retrieving the vehicle.

---

[1]     Ms. Finch's telephone number is (866) 631-3788, Ext. 79319; her email is kfinch15@ford.com.

35.     Had Plaintiffs known of the oil pump defect, they would not have purchased the Ford EcoSport vehicle or any other Ford model with the 1.0L EcoBoost engine containing the defective oil pump. Alternatively, had Plaintiffs known of the oil pump defect, they would not have paid the amount that they paid for the EcoSport vehicle.

**The Oil Pump's Defective Design in 1.0 EcoBoost Engines**

36.     Ford has been designing and manufacturing vehicles with the same or substantially similar EcoBoost 1.0L engines as those in Class Vehicles. The Class Vehicles have identical EcoBoost 1.0L engines that do not materially differ from the EcoBoost 1.0L engines installed in previous model years.

37.     These similarities extend to the oil pumps used in previous model years and those installed in Class Vehicles.

38.     The purpose of engine oil is to lubricate the engine. If an oil pump has insufficient pressure, then the engine will not have the necessary lubrication, causing premature wear and tear.

39.     Insufficient oil (caused by a lack of oil or a lack of oil pressure) can also result in engine stalling or seizing while the vehicle is in use.

40.     When an oil pump fails, it causes insufficient oil pressure, thereby causing complete engine failure.

41.     Some oil pumps are belt-driven, meaning they utilize belt tensioners to keep the belt at the correct tension level and oil pressure at a consistent rate. If the belt is not calibrated correctly, then the belt suffers from premature wear and causes oil pressure to drop.

42.     Ford and other automakers adopted a "wet belt" or "belt-in-oil" designs where the belt sits inside the oil sump and is in direct contact with the engine oil.

43.     Ford uses the "wet belt" design in earlier models of several vehicles, Plaintiffs'

EcoSport vehicle, and all Class Vehicles.

44.     Ford's oil pumps using the "wet belt" design suffer from a universal design defect

in that they (1) fail to maintain adequate oil pressure, thereby necessitating complete replacement

of a vehicle's long block and turbocharger; (2) allow pieces of the belt tensioner to disintegrate

because of improper tension and circulate throughout the engine; and (3) allow metal pieces of the

engine to come into contact with each other and cause damage in the form of metal shavings and

pieces circulating through the engine.

45.     Simply put, when the oil pump fails, the engine does not get sufficient lubrication

at the correct pressure, causing debris to break loose and circulate throughout the engine. This

debris causes engine failure that requires complete engine replacement—a repair that costs vehicle

owners several thousands of dollars.

46.     Explained another way:

> In several tear-downs and complaints, internet mechanics are
> reporting that **the oil pump belt tension is often the point of
> failure**.
>
> When the tensioner fails, the belt will begin to shred its teeth and
> material will enter the oil pan. Next, the material will enter the oil
> pickup and can either begin to starve the motor, resulting in metal
> shavings appearing in the oil, or the belt will continue to shred and
> eventually the vehicle will lose oil pressure when the pump can no
> longer be turned.

Rob Stumpf, *Self-Clogging Ford Oil Pumps Lead Feds to Investigate 1.0-Liter EcoBoost*

*Engines*, The Drive (September 22, 2023) (emphasis added).[2]

---

[2]     Available at https://www.thedrive.com/news/self-clogging-ford-oil-pumps-lead-feds-to-investigate-1-0-liter-ecoboost-engines?utm_term.

**Ford Knew or Should Have Known of the Oil Pump Defect**

47.     Ford designs, manufacturers, distributes, sells, and leases the Class Vehicles, including Plaintiffs' EcoBoost vehicle.

48.     Plaintiffs' EcoBoost and other Class Vehicles contain a defective oil pump that loses pressure and destroys the engine.

49.     According to Ford, the service interval for its oil pumps is 150,000 miles, yet pumps on Class Vehicles often fail much earlier.

50.     "This issue isn't exactly new," according to a leading industry publication discussing the oil pump defect in the 1.0L EcoBoost engine. Rob Stumpf, *Self-Clogging Ford Oil Pumps Lead Feds to Investigate 1.0-Liter EcoBoost Engines*, The Drive (September 22, 2023).

51.     In fact, in 2019—years before Plaintiffs purchased their EcoSport vehicle—Ford issued a "Special Service Message" regarding the 1.0L EcoBoost engine:

> **SSM 48093** – 2019-2019 EcoSport – 1.0L EcoBoost – 6F15 – Loss Of Engine Oil Pressure With Illuminated Engine Oil Warnings Lamp – Built On Or Before 3-Apr-2019
>
> Some 2018-2019 EcoSport vehicles equipped with a 1.0L EcoBoost engine and a 6F15 automatic transmission and built on or before 3-Apr-2019 may exhibit a loss ofengine oil pressure with an illuminated oil pressure warning lamp. This may be due to a broken/failed engine oil pump belt tensioner which leads to a loss of engine oil pressure. Due to the nature of this failure, an engine replacement maybe required.
>
> Engines built after 3-Apr-2019 should not be affected. All tensioners built with a manufacture date on or after 23-Jan-2019 are good to use.
>
> APPLICABLE VEHICLES  2018 - 2019 CAR:  ECOSPORT[3]

---

[3]     Available at https://static.nhtsa.gov/odi/tsbs/2019/MC-10163588-0001.pdf.

52.    In 2021, Ford expanded its SSM to include additional vehicles built with the same 1.0L motor, including the Ford Focus. *See* Ford SSM 49726. This SSM (1) expanded the scope of the SSM to Ford Focus vehicles; (2) expanded the applicable time period to EcoSport and Focus vehicles built on or before July 3, 2019 (rather than April 2019); and (3) stated that "no further diagnostics should be performed" for engines exhibiting oil pressure below 10 psi and/or metal contamination—for these vehicles, dealerships were advised to "[r]eplace the engine assembly to correct this condition."[4]

53.    A later SSM called for Ford dealerships to replace the long block and turbocharger entirely—the same repair performed on Plaintiffs' EcoBoost vehicle. Ford SSM 49918.[5]

54.    Ford's SSMs reflect a muted, too-late response to a persistent and growing chorus of online complaints—and even that response constitutes a failure to acknowledge the defect and repair it for consumers.

55.    Multiple mechanics on YouTube have posted videos criticizing the oil pump design and pointing out the defects associated with the wet-belt design:

- JUNK Ford EcoSport 1.0L 3-Cylinder Ecoboost Teardown[6];

- Poor designing led to this failure! 2018-2021 Ford EcoSport Oil Pump Belt[7]; and

- 1.0 liter Ford eco-boost 3 cylinder oil pump belt tensioner fails & kills belt-engine not good.[8]

---

[4]    Available at https://static.nhtsa.gov/odi/tsbs/2021/MC-10191089-0001.pdf.

[5]    Available at https://static.nhtsa.gov/odi/tsbs/2021/MC-10198663-0001.pdf.

[6]    Available at https://www.youtube.com/watch?v=0yx1-50iqnA&t=780s.

[7]    Available at https://www.youtube.com/watch?v=T1XYUrYKmp4&t=15s.

[8]    Available at https://www.youtube.com/watch?v=H6-RFvuvokM&t=1s.

56.     Ford became aware of the Defect at least as early as 2011, well before Plaintiffs and Class Members purchased their Class Vehicles. Ford learned of the Defect through sources such as pre-release evaluation and testing including thermal testing; repair data; replacement part sales data; early consumer complaints made to Ford and/or NHTSA, and/or posted on public online vehicle owner forums; testing done in response to those complaints; aggregate data from Ford dealers; as well as through other internal sources unavailable to Plaintiffs prior to discovery.

57.     While designing, manufacturing, engineering, and testing Class Vehicles in advance of the vehicles' release, Ford would have gained comprehensive and exclusive knowledge about the 1.0L EcoBoost engines and the oil pumps installed in those Vehicles. Adequate pre-release analysis of the design, engineering, and manufacture of the 1.0L EcoBoost engine in the Class Vehicles would have revealed to Ford that the design and/or manufacture of the oil pump was defective and susceptible to failure as outlined above.

58.     Indeed, Ford worked with FEV, Inc. in developing the 1.0L EcoBoost engine. According to FEV, they "provided support in the area of design and [computer aided design], combustion development, and engine build for 36 engines."[9] Those engines would have been tested extensively to ensure proper operation and necessarily revealed the limitations of the oil pump integrated into the 1.0L EcoBoost engine.

59.     Aside from its own design research and the multiple mechanics posting on YouTube concerning the oil pump defect, Ford knew or should have known of the defect based on publicly available complaints filed by consumers with the National Highway Traffic Safety Administration (NHTSA) and other forums.

---

[9]     Available at https://www.fev.com/en/media-center/press/press-releases/news-article/article/fev-inc-displays-ford-10l-ecoboost-engine-at-sae-world-congress.html.

60.     Ford and other automakers monitor NHTSA databases for consumer complaints regarding their automobiles as part of their ongoing obligation to identify potential defects in their vehicles, including those which are safety related, such as spontaneous engine fires.

61.     Below is a review of several complaints filed with NHTSA regarding Class Vehicles.

62.     The following customer complaints were posted on NHTSA's website regarding the 2018 Ford EcoSport:[10]

- Posted August 16, 2022
  "The contact owns a 2018 Ford Ecosport. The contact stated while driving 75 MPH, the message "Low Engine Oil Pressure" was displayed. The contact veered to the side of the road. The contact turned off and restarted the vehicle; however, the failure persisted. The contact was able to continue driving at 20 MPH. The vehicle was taken to an independent mechanic where it was diagnosed that the timing belt had failed and damaged the engine. The independent mechanic diagnosed that the engine needed to be replaced. The manufacturer was notified of the failure and referred the contact to the dealer. The dealer informed the contact that the VIN was not under recall. The vehicle was not repaired. The failure mileage was approximately 69,000."

- Posted August 7, 2022
  "The contact owns a 2018 Ford Ecosport. The contact stated that while driving at 50 MPH, the low engine oil pressure warning message appeared on the instrument panel. The contact managed to pull over and replenished the engine with oil; however, soon after start-up, an abnormal, knocking noise began to emit from the engine as black smoke also emitted from the engine. The vehicle began to lose power as the contact pulled over and shut off the engine. The contact had the vehicle towed to a dealer where it remained in their possession. The vehicle had yet to be repaired. The manufacturer for notified of the failure. The failure mileage was 58,198."

- Posted July 15, 2022
  "I was pulling on to the highway and out the clear random, my oil pressure light came on and I heard a clunk. I pulled over and started it back up and the light still came on. I was going to attempt to drive the 3 miles home and the car gave out. No one can find any reason my vehicle did this. The oil was changed 4 days prior and all of the oil was applied and properly placed. I am looking into legal action. We may have a class action lawsuit. If anyone would like to be a part, contact me, [ ].

[10]     Available at https://www.nhtsa.gov/vehicle/2018/FORD/ECOSPORT/SUV/FWD.

This is not ok or fair. I have been fired from my job, this has negatively impacted my family and it's just inconvenient."

- <u>Posted July 9, 2022</u>

  "Warning across dashboard stated engine oil pump pressure low then heard grinding noise. Towed to mechanic and found out the oil pump belt was broken and had metal in engine causing engine to fail also messing up turbo. Have to now replace engine with turbo which is costly but still owe on vehicle. Engine is $7000+ and is extremely hard to find plus was told the problem will most likely happen again. If I had been driving when this happened the motor would have locked up causing an accident and could have possibly been fatal per mechanic."

- <u>Posted July 2, 2022</u>

  "While driving my 2018 ecosport, i got a warning of "low oil pressure". I thought my car was losing oil so I stopped. Checking the oil noticed that had all the oil and there was no leak. Next day took it to Pep Boys, since it was Sunday July 3rd, and told me the diagnostic (PO365 camshaft pos sensor) Ford warranty is of 60,000 miles (i have just under 88,000 on my car). They advised me to take it to my local ford dealership to have a second opinion, since they don't do that type of job. Ford dealer confirmed the same problem, and if so, I would need a new motor because they do not open this type of motor to fix it. I contacted ford customer service to bring the problem to their attention and they told me there was nothing they could do. upon further investigation I have found this is chronic problem with the 1.0 turbo ecoboost engines and found a class action lawsuit (from CSK&D-FORD ECOSPORT ECOBOOST DEFECT -CLASS ACTION INVESTIGATION) started against ford for this specific issue, and they still will not help me cover the costs. I cannot afford to replace the engine and still owe too much on the car to try to trade it in. it has caused a major hardship on my fiancé and I, trying to find a jobs since this car was my UBER only job, while prices of parts and gas are skyrocketing. I have only had this car for 3 years and under 88,000 miles and it is completely undrivable due to the faulty and carless engineering.Started driving home and noticed a significant decrease in power and the engine ceased and died. Had car towed home."

- <u>Posted June 6, 2022</u>

  "Started with the oil pressure engine light coming on and off always told it's a sensor then 2 days it wasn't putting any oil to one of the rocker arms and told by a dealership that it's going to cost me$7500 for a whole new engine when all they did was their diagnostic test."

- Posted February 27, 2022

    "The contact owns a 2018 Ford Ecosport. The contact stated that while driving at an undisclosed speed, the vehicle made abnormal sounds and then lost motive power. The low oil pressure warning light was illuminated. The vehicle was towed to the contact's residence, where an independent mechanic diagnosed the vehicle with oil pump failure. The contact was informed that the oil pump needed to be replaced; however, parts were on backorder. The vehicle was not repaired. The manufacturer was not made aware of the failure. The failure mileage was approximately 85,900."

63.     The following customer complaints were posted on NHTSA's website regarding the 2019 Ford EcoSport:[11]

- Posted August 16, 2022

    "I was driving my car at 35 miles and my car started accelerating and making noise and warning light illuminated and I have to emergency pullover, my 2019 EcoSport have 69,400 miles. Now the Ford dealer said is an TSB on my car and I need to call Ford Company because my extended warranty is expired. The report from dealer said that is an SSM 49918 For loss of engine oil pressure."

- Posted July 23, 2022

    "Since I leased this car, I've had three transmission replacements, a full wiring harness replacement, numerous electrical issues with the display, and now can't drive it due to engine low oil pressure. This car is nothing but a nightmare."

- Posted May 5, 2022

    "Oil pump belt shredded without warning at 62,000 miles causing complete engine failure while driving in traffic. Multiple warning lights illuminated, but failure was abrupt and immediate. Car was performing normally and then within a matter of seconds I experienced complete loss of power. Vehicle is presently at the Ford garage. Ford representative told us that the belt for the oil pump shredded and caused loss of oil pressure which lead to a complete loss of power."

- Posted April 9, 2022

    "The contact owns a 2019 Ford Ecosport. The contact stated that while driving

[11]     Available at https://www.nhtsa.gov/vehicle/2019/FORD/ECOSPORT/SUV/FWD

at an undisclosed speed, the brakes seized and the vehicle lost motive power. The check engine, battery, and ABS warning lights were illuminated. The contact replaced the battery; however, the failure recurred. The vehicle was not diagnosed nor repaired by an independent mechanic or dealer. The manufacturer was made aware of the failure and advised the contact to file a complaint with NHTSA. The failure mileage was approximately 55,000."

- Posted January 8, 2020
  "I WAS A STOP LIGHT AND THE VEHICLE SUDDENLY SHUT OFF AND WOULD NOT LET ME RESTART IT. AFTER AWHILE AND A FEW WARNING SYSTEMS THE VEHICLE FINALLY TURNED OVER. AFTER THAT THE ENGINE LIGHT CAME ON AND THE VEHICLE STARTED TO RUN A DIAGNOSTICS WHICH I WAS UNABLE TO SEE. AS I BEGIN TO DRIVE AGAIN THE VEHICLE STABILITY CONTROL CUTS OFF AND CAUSES ME TO TEMPORARILY LOSE CONTROL OF THE VEHICLE. AS I'M REGAINING CONTROL OF THE VEHICLE THE TRACTION CONTROL TAKES OVER AGAIN AND HELPS ME OUT. I'M NOT SURE AS TO WHAT HAPPENED TO MY VEHICLE STILL WAITING FOR THE DEALER TO GET BACK TO ME. BUT WHATEVER IT WAS IT WASN'T SAFE AND PUT ME IN A DANGEROUS SPOT DURING RUSH HOUR TRAFFIC"

64. The following customer complaints were posted on NHTSA's website regarding the 2020 Ford EcoSport:[12]

- Posted April 25, 2023
  "While driving my 2020 Ford Ecosport it spontaneously caught fire and exploded on Sunday, May 29th. •I purchased my 2020 Ford Ecosport from Ford or Helfman Ford in Stafford Texas on Monday, May 25th, 2020. I immediately had problems with the vehicle and have taken the vehicle in multiple times for overheating issues and the check engine light coming on. •May 25th, 2020 – overheating and coolant light came on. Vehicle taken to Planet Ford in Dallas May 28, 2020. Vehicle repaired and picked up from Planet Ford on May 29th, 2020. •May 30th, 2020 - check engine light came back on. Vehicle taken back to Planet Ford in Dallas June 2, 2020 and I picked it up. Vehicle repaired and picked and I picked June 5, 2020. April 2nd, 2021, I took it the vehicle to Helfman Ford for routine maintenance and the continuous check engine light problem. I received the car back the same day with paperwork stating that they could not re-create the problem. •August 4th 2021, I took it back to Helfman Ford, vehicle was running very rough and was extremely loud. On 10/06/2020 the vehicle was returned after extensive repairs were done to exhaust and engine under warranty (see repair invoice). •My check engine light and coolant light continued to come on sporadically producing the same error messages

[12]     Available at https://www.nhtsa.gov/vehicle/2020/FORD/ECOSPORT/SUV/FWD

in the Ford app for my car. •On May 7, 2022 My check engine light come back on and I received an error message that I had never seen prior but as soon as I stopped the message went away •On May 17, 2022 I took the car in one final time too Planet Ford Dallas. They replaced the coolant sensor but were not able to replicate the error and I was told since they could not produce the error, •On May 29, 2022 at 2:08 while driving the check engine came on, and I lost all engine power. Smoke started coming from the engine area and within seconds from exiting the vehicle the engine was on fire and the car exploded."

- Posted March 8, 2023

  "Was leaving work and suddenly the oil pressure light came on and the engine started making a terrible noise. I pulled over and had the car towed to the Ford dealership. The dealership inspected it and said that the oil pump belt "shredded" and the sudden loss of oil pressure, along with the debris from the oil pump belt, completely ruined both the motor and the turbo requiring full replacement of both at a cost of $6500. Car was purchased new less than 2 1/2 years before but Ford will not pay for the repairs."

- Posted December 13, 2022

  "Driving on the interstate the low oil pressure light came on no check engine lights or anything . The oil pump is belt driven aka wet belt and the rubber teeth come off stopping up the oil pump and causing it not to work properly . With the rubber pieces going into the motor the rubber melts causing issues with the pistons and engine block. The Ford dealership recommends not replacing just the oil pump because of all the other issues the rubber belt causes because it melts inside the engine . So I am left with no choice but to replace the engine at a cost of 5,000.00. Why there hasn't been a recall is questionable . I am in the process of getting said motor replaced but does that mean every 2 years it will have same issues ?"

65.    The following customer complaint was posted on NHTSA's website regarding the

2021 Ford EcoSport:

> The contact owns a 2021 Ford EcoSport. The contact stated that while driving at 55 MPH, the low-pressure oil message appeared on the instrument panel. The contact pulled the vehicle off to the shoulder of the highway and had the vehicle towed to the dealer. Once at the dealer, a diagnostic test was performed and showed that the oil pump and the oil pump belt had malfunctioned, which resulted in engine damage. The manufacturer was notified of the failure. The vehicle was not repaired. The failure mileage was approximately 60,539.

Available at https://www.nhtsa.gov/vehicle/2021/FORD/ECOSPORT/SUV/FWD (posted Feb. 27, 2023).

66.     The following NHTSA complaints relate to the 2016 Ford Focus:[13]

- Posted October 4, 2017
  "Driving on the interstate the low oil pressure light came on no check engine lights or anything . The oil pump is belt driven aka wet belt and the rubber teeth come off stopping up the oil pump and causing it not to work properly . With the rubber pieces going into the motor the rubber melts causing issues with the pistons and engine block. The Ford dealership recommends not replacing just the oil pump because of all the other issues the rubber belt causes because it melts inside the engine . So I am left with no choice but to replace the engine at a cost of 5,000.00. Why there hasn't been a recall is questionable . I am in the process of getting said motor replaced but does that mean every 2 years it will have same issues ?"

- Posted April 24, 2017
  "TL* THE CONTACT OWNS A 2016 FORD FOCUS. THE CONTACT STATED THAT THE VEHICLE EXPERIENCED A COMPLETE LOSS OF POWER AND WOULD NOT ACCELERATE WHEN THE ACCELERATOR PEDAL WAS DEPRESSED. ALSO, THE OVERHEATING WARNING INDICATOR ILLUMINATED AND THE VEHICLE ENTERED INTO "LIMP HOME" MODE, WHICH ALLOWED THE USE OF THE VEHICLE BUT NOT OVER 5 MPH. THE VEHICLE WAS TAKEN TO THE DEALER WHERE IT WAS DIAGNOSED THAT THE VEHICLE EXPERIENCED MULTIPLE ENGINE FAILURES AND THE ENGINE WOULD NEED TO BE REPLACED. THE VEHICLE WAS REPAIRED, BUT THE TRANSMISSION WARNING INDICATOR ILLUMINATED AND THE VEHICLE STILL EXPERIENCED HESITATION. THE MANUFACTURER WAS NOT NOTIFIED OF THE FAILURES. THE FAILURE MILEAGE WAS 14,000. UPDATED 08/29/17*LJ *CN"

- Posted April 11, 2019
  "TL* THE CONTACT OWNS A 2016 FORD FOCUS. THE CONTACT TOOK THE VEHICLE TO SAM GALLOWAY FORD LINCOLN (1800 BOY SCOUT DR, FORT MYERS, FL 33907, (888) 699-0916) DUE TO ENGINE FAILURE.

---

[13]     Available at https://www.nhtsa.gov/vehicle/2016/FORD/FOCUS%252520RS/5%252520HB/AWD.

THE DEALER REFUSED TO REPAIR THE VEHICLE BECAUSE IT WAS NINE MILES OVER THE WARRANTY COVERAGE MILEAGE LIMIT. THE DEALER SUGGESTED A COMPLETE REPLACEMENT OF THE ENGINE AT THE CONTACT'S EXPENSE. THE MANUFACTURER WAS NOT CONTACTED. AN INDEPENDENT MECHANIC REPLACED THE ENGINE, WHICH ONLY LASTED ONE WEEK. THE MECHANIC REPLACED THE ENGINE WITH ANOTHER ONE, WHICH LASTED SEVERAL MONTHS BEFORE FAILING AGAIN. THE CONTACT STATED THAT THE VEHICLE WAS CURRENTLY STRANDED IN ANOTHER STATE. THE FAILURE MILEAGE WAS UNKNOWN."

- Posted October 12, 2019
  "AT HIGHWAY SPEED, VEHICLE WENT INTO LIMP MODE RESTRICTING THROTTLE RESPONSE WITH NO DASH INDICATORS. UNABLE TO ACCELERATE. NO CHECK ENGINE LIGHT, NO MESSAGES, ALL GAUGES IN NORMAL RANGE. UNSAFE CONDITION WHEN VEHICLE RESPONDS VERY SLOWLY WITH NO INDICATOR FOR DRIVER. VEHICLE IS THE 1.0 L ECOBOOST WITH 6MT TRANSMISSION."

- Posted August 13, 2020
  "MY ENGINE HAD RUBBER PIECES IN IT FROM THE BELT INSIDE THE ENGINE EXPLODING - I HAVE AN EXTENDED WARRANTY AND FORD WILL NOT COVER IT DUE TO THE TENSIONER BELT BROKE TOO WHICH IS NOT A COVERED PART"

- Posted July 29, 2020
  "ENGINE TROUBLE AT 62,000 MILES - METAL SHAVINGS IN THE OIL"

- Posted October 28, 2020
  "WAS DRIVING DOWN THE INTERSTATE AT ROUGHLY 80 MILES PER HOUR WHEN THE CHECK ENGINE LIGHT CAME ON. ENGINE LOST POWER AND WOULD NOT ACCELERATE. ENGINE STARTED MAKING A LOUD NOISE. CAR WILL STILL START BUT IS NOT DRIVABLE AND ENGINE HAS NO OIL PRESSURE AND MECHANIC SAID IT DOWNSHIFTED TO 4TH GEAR AT 83 MPH. CAR HAS BEEN SERVICED REGULARLY AND HAS GIVEN NO INDICATION OF ENGINE PROBLEMS. WAS QUOTED $4500 AT FIRST FORD DEALERSHIP TO REPAIR CAR WITH A USED MOTOR WITH EQUAL MILEAGE. 2ND FORD DEALERSHIP QUOTED $3700 WITH REBUILT MOTOR. HAS BEEN LOOKED OVER BY 2 MECHANICS INCLUDING FORDS AND OTHER THAN READING DIAGNOSTICS NOBODY CAN PROVIDE A REASON THE OIL PRESSURE DROPPED OR WHY THE CAR DOWNSHIFTED INTO 4TH GEAR UPING THE RPM'S CAUSING ENGINE PROBLEMS. THEY SAID THERE IS NO OTHER PROBLEMS WITH THE CAR AT THIS POINT OTHER THAN THE

ENGINE. VERY NO SMART TO REPLACE AN ENGINE WITHOUT KNOWING THE WHAT CAUSED THE INITIAL ONE TO FAIL."

67.    The following customer complaints on NHTSA's website relate to the 2017 Ford Focus:[14]

- Posted June 20, 2019
  "I WAS DRIVING ON THE FREEWAY JUST GETTING OFF ONTO THE OFF RAMP WHEN THE ENGINE LIGHT, OIL LIGHT AND WARNING MESSAGE CAME ON. THE ENGINE LOST COMPRESSION INSTANTLY AND REDUCED SPEED DOWN TO 30 MPH."

- Posted July 11, 2020
  "WHILE COMING DOWN A HILL MY VEHICLE'S ENGINE BEGAN TO BIG DOWN AS IF TO STALL. MY ENGINE OIL LIGHT CAME ON, I PULLED INTO A LOCAL OIL SERVICE STATION TO HAVE THEM CHECK THE OIL, (PREVIOUS SERVICE WAS APPROXIMATELY 1 MONTH PRIOR AND IT HAD ONLY BEEN APPROXIMATELY 1200 MILES SINCE LAST SERVICE). THEY SAID THAT THE OIL WAS FINE BUT I HAD THEM CHANGE THE OIL AGAIN JUST TO BE SURE. THE OIL LIGHT REFUSED TO GO OUT. I THEN HAD THE VEHICLE TOWED TO THE CLOSEST FORD DEALERSHIP BECAUSE THE VEHICLE BECAME UNSAFE AND COULD NOT BE DRIVE ACCORDING TO THE SERVICE STATION. AFTER A WEEK AT THE FORD DEALERSHIP IT WAS DETERMINED THAT THE ENGINE WAS NO LONGER HOLDING OIL PRESSURE AND THAT VARIOUS COMPONENTS INSIDE THE ENGINE HAD NOW STARTED THROWING THE CHECK ENGINE LIGHT. THE DEALERSHIP INFORMANT ME IT WOULD BE APPROXIMATELY $7700 TO REPLACE THE ENGINE, AS THE VEHICLE'S ENGINE IS IN A STATE OF FAILURE. THE VEHICLE HAS BEEN TOWED FROM THE DEALERSHIP AND SITTING IN MY DRIVEWAY AT 71457 MILES... THE DEALERSHIP SAYS THAT BECAUSE THE VEHICLE IS 11450 MILES OUT OF WARRANTY THAT THERE IS NOTHING THEY CAN DO. VEHICLE WAS REGULARLY SERVICED. I HAVE READ VARIOUS OTHER COMPLAINTS ABOUT THIS YEAR MAKE AND MODEL HAVING THE SAME ISSUE WHICH HAS LEAD TO THE VEHICLES BECOMING UNSAFE TO DRIVE AND ULTIMATELY UNABLE TO BE DRIVEN."

---

[14]    Available at https://www.nhtsa.gov/vehicle/2017/FORD/FOCUS/5%252520HB/FWD

- Posted June 26, 2020

"I WAS COMING OFF FREEWAY AND GETTING ONTO ANOTHER FREEWAY WHEN, AS I WAS SPEEDING UP TO MERGE, MY CAR BOGGED DOWN AS IF RUNNING OUT OF GAS. I LOOKED AT THE DASH AND SAW MY OIL LIGHT HAD COME ON. SO I PULLED OVER TO AN EXIT WITHIN 30 YDS. AND PULLED ONTO A STREET ABOUT ANOTHER 30 YDS. AWAY. I SHUT OFF THE CAR AND LET IT SIT A FEW MINUTES THEN CHECKED OIL. WHEN I DID, THE OIL SHOWED FULL. I THEN CALLED THE FORD DEALER I TAKE MY CAR TO FOR OIL CHANGES AND SPOKE WITH A SERVICE GUY AND TOLD HIM WHAT HAPPENED. HE WAS PUZZLED AND ASKED A FEW QUESTIONS AND THEN WE TRIED TO RESET THE OIL LIGHT. AFTER DOING THE RESET THE OIL LIGHT CAME BACK ON. I TRIED STARTING THE CAR AND IT STARTED FINE. NO ABNORMAL SOUNDS COMING FROM THE ENGINE AND IT IDLED FINE. I DECIDED TO TRY THE FREEWAY AGAIN TO SEE IF THE OIL LIGHT WAS A FLUKE. THE NEXT EXIT WAS ONLY A HALF MILE AWAY SO I COULD EASILY GET OFF FREEWAY IF NECESSARY. AGAIN, THE FREEWAY WAS ONLY ABOUT 30 YDS AWAY SO WHEN I STARTED TO MERGE ONTO THE FREEWAY THE SAME THING HAPPENED. THE CAR ACCELERATED SLOWLY AND THEN BOGGED DOWN AND THE DASH FLASHED THE ENGINE NEEDED ATTENTION OR SOMETHING LIKE THAT. AGAIN I GOT OFF AT THE NEXT EXIT, WHICH WAS RIGHT THERE WHEN IT HAPPENED. I HAD THE CAR TOWED TO THE FORD DEALER NEAR WHERE I LIVE. SERVICE WAS CLOSED BUT SOME SALES PEOPLE WERE STILL THERE AND THEY TOLD US WHERE TO PUT THE CAR. THEY DIDN'T LOOK AT THE CAR UNTIL MONDAY AND EVEN THEN THEY DIDN'T REALLY OPEN THE CAR UP AND LOOK AT IT. THE TECHNICIAN SAID PROBABLY THE TIMING/OIL PUMP BELT BROKE OR SHREDDED AND CLOGGED UP THE OIL PUMP. TO OPEN UP THE ENGINE WOULD COST $800 TO FIND OUT THE ACTUAL PROBLEM AND IF THE TECH WAS RIGHT THE ENGINE WOULD HAVE TO BE REPLACED COSTING $7400. ALL THIS BECAUSE OF A FAULTY BELT DESIGNED TO LAST 125,000-150,000 MILES. LUCKILY I WASN'T DRIVING 65MPH IN THE MIDDLE OF THE FREEWAY AND BREAKING DOWN AND GETTING SLAMMED. *TR"

- Posted June 24, 2020

"TL* THE CONTACT OWNS A 2017 FORD FOCUS. THE CONTACT STATED THAT WHILE DRIVING AT 45 MPH, THE OIL LEVEL WARNING LIGHT FLASHED ON THE INSTRUMENT PANEL. THE CONTACT

PULLED THE VEHICLE OVER AND INSPECTED THE VEHICLE BUT FOUND NO ISSUES WITH THE VEHICLE. THE CONTACT CALLED PERRY FORD OF POWAY (12740 POWAY RD, POWAY, CA 92064, (858) 748-1400) AND SPOKE WITH A REPRESENTATIVE WHO ATTEMPTED TO ASSIST WITH THE WARNING LIGHT FAILURE. THE CONTACT WAS UNABLE TO RESET THE WARNING LIGHT AND ATTEMPTED TO RESUME NORMAL DRIVING HOWEVER, THE FAILURE RECURRED. THE VEHICLE WAS TOWED TO THE SAME DEALER BUT WAS NOT REPAIRED. THE MANUFACTURER WAS NOTIFIED OF THE FAILURE AND THE CONTACT WAS INFORMED THAT THE VEHICLE WAS OUT OF WARRANTY. NO FURTHER ASSISTANCE WAS PROVIDED. THE FAILURE MILEAGE WAS 68,000.*DT MECHANIC TOLD THE CONSUMER THERE WERE ISSSUES WITH TIMING/OIL PUMP BELT (LOCATED INSIDE THE ENGINE) BROKE/SHRED. OIL PRESSURE DROPPED AND PIECES OF BELT CLOGGED OIL PUMP AND ALSO CIRCULATED THROUGH THE ENGINE. ENGINE NEEDS REPLACEMENT. ESTIMATED COST: $7100. *JB"

- Posted November 2, 2020
  "ENGINE LOCKED UP WHILE DRIVING AND SHUT DOWN"

68.     Many of these complaints pre-date Plaintiffs' purchase of their EcoSport vehicle.

69.     And all of the complaints pre-date the March 2023 destruction of Plaintiffs' engine because of the oil pump defect. This is important because there is a window of opportunity to repair the engines on Class Vehicles after the oil pump begins to fail, but before the engine is destroyed. According to mechanics, when "the tensioner fails and there is no longer any oil pressure . . . most cars will keep driving like this until the 'Low Oil Pressure' warning crops up, at which point [mechanics] get it." Stumpf, *Self-Clogging Ford Oil Pumps Lead Feds to Investigate 1.0-Liter EcoBoost Engines*, *supra*. Thus, if Ford notifies owners of Class Vehicles of the defect—a step it refuses to take to date—then owners may be able to initiate a repair before the entire engine is destroyed.

70.     In addition to the pre-sale testing and post-sale consumer complaints outlined above, Ford also should have learned of this widespread defect from the many reports received from dealerships and from customer complaints directly to Ford, as those reported by Plaintiffs.

Ford's customer relations and technical service departments collect and analyze field data including, but not limited to, repair requests made at dealerships, technical reports prepared by engineers who have reviewed vehicles for which warranty coverage is being requested, parts sales reports, and warranty claims data. Discovery will also show that Ford received tens of thousands of complaints about the 1.0L Engine, including about coolant issues, fuel pump issues, as well as the oil pump issues.

**NHTSA Opens EcoBoost Investigation**

71.     In response to these and other complaints, NHTSA initiated a Preliminary Evaluation (PE) into the EcoBoost engines in late September 2023 (Investigation PE23015).

72.     NHTSA's PE was in response to at least 95 complaints lodged with the agency concerning the EcoBoost engines.

73.     The PE is focused on 2018-2021 Ford EcoSport vehicles—the same model owned by Plaintiffs.

74.     The identified problem is that "[t]he oil pump may fail resulting in a loss of motive power."

75.     According to NHTSA:

> The Office of Defects Investigation (ODI) has received 95 consumer complaints alleging engine failure due to loss of oil pressure in model year (MY) 2018-2021 Ford EcoSport vehicles. Some consumers report a low engine oil pressure warning lamp immediately preceding a complete loss or reduction of motive power while the vehicle is in motion. This may be due to a failed engine oil pump assembly. Engine replacement is required due to the nature of this failure.

Available at https://www.thedrive.com/uploads/2023/09/22/INOA-PE23015-10500.pdf.

76.   In the meantime, because of Ford's failure to act, consumers like Plaintiffs and the Class are left to fend for themselves, all the while incurring significant damages due to a defect that has been known to Ford for years.

77.   This case seeks damages for Plaintiffs and the Class based on Ford's omissions and failure to disclose the defect.

## TOLLING

78.   Any applicable statute of limitations that might otherwise bar any Class member's claim has been tolled by Ford's knowing and active concealment of the facts alleged above. Plaintiffs and Class members were ignorant of vital information essential to the pursuit of their claims. Plaintiffs and Class members could not reasonably have discovered that their Class Vehicles were defective because Ford did not provide relevant information about the defect to the NHTSA or to vehicle owners/lessors and continues to refuse to provide such notice to consumers.

## CLASS ACTION ALLEGATIONS

79.   Plaintiffs bring this action on behalf of themselves, and as a class action under Federal Rule of Civil Procedure 23, on behalf of the members of the Class defined as:

> All current and former owners or lessees of Class Vehicles who reside in and/or purchased their Class Vehicle in the State of Missouri.

80.   Excluded from the Class are Defendants, their officers, directors and employees; any entity in which Defendant has a controlling interest; and any affiliate, legal representative, heir or assign of any Defendant. Also excluded from the Class are any judicial officer(s) presiding over this action and the members of his/her/their immediate family and judicial staff, jurors, and Plaintiffs' counsel and employees of their law firms.

81. ***Numerosity:*** Ford sold hundreds of thousands of Class Vehicles, including a substantial number in Missouri. Thus, members of the proposed Class likely number in the hundreds or thousands and are thus too numerous to practically join in a single action. Class members may be notified of the pendency of this action by mail, supplemented by published notice (if deemed necessary or appropriate by the Court).

82. ***Predominance:*** Common questions of law and fact exist as to all members of the Class and predominate over any question affecting only individual Class members. These common legal and factual questions, each of which also may be certified under Rule 23(c)(4), include whether:

    a.  The oil pumps in Ford's 1.0L EcoBoost engines are defective;

    b.  Ford knew or should have known about the oil pump defect and, if so, when Ford discovered it;

    c.  The oil pump defect constitutes a safety risk that Ford is obligated to disclose to members of the Class;

    d.  Ford disclosed the defect to Class members or instead omitted and/or concealed it;

    e.  Ford's conduct violated the Missouri Merchandising Practices Act;

    f.  Ford's conduct was unjust;

    g.  Ford's conduct harmed Plaintiffs and the Class;

    h.  Plaintiffs and the Class are entitled to damages;

    i.  Ford's conduct violated Missouri law; and

    j.  The appropriate measure of class-wide damages.

83.    ***Typicality:*** Plaintiffs' claims are typical of the claims of the members of the Class because their claims arise from the same course of conduct by Ford. Plaintiffs and the Class either purchased or leased a Class Vehicle that contains the same oil pump defect, giving rise to substantially the same claims.

84.    ***Adequacy:*** Plaintiffs are adequate representatives of the proposed Class because their interests do not conflict with the interests of the members of the Class they seek to represent. Plaintiffs have retained counsel competent and experienced in complex class action litigation, and Plaintiffs will prosecute this action vigorously by monitoring and directing the actions of class counsel. The interests of members of the Class will be fairly and adequately protected by Plaintiff and her counsel.

85.    ***Superiority:*** A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The prosecution of separate actions by individual members of the Class would impose heavy burdens on the Court and Ford, and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class. A class action, on the other hand, would achieve substantial economies of time, effort, and expense, and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results. Absent a class action, it would not be feasible for the members of the Class to seek redress for the violations of law alleged herein.

86.    Additionally, the Class may be certified under Rule 23(b)(1) and/or (b)(2) because:

a.    The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Ford;

b.  The prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudication, or substantially impair or impede their ability to protect their interests; and/or

c.  Ford has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final and injunctive relief with respect to the Class members as a whole.

## COUNT I
### Violation of the Missouri Merchandising Practices Act
### (Brought by Plaintiffs and on behalf of the Class)

87.     Plaintiffs, on behalf of themselves and the proposed Class, hereby re-allege the paragraphs above as if fully set forth herein.

88.     The Missouri Merchandising Practices Act ("the MMPA") provides that "[t]he act, use or employment by any person of any deception . . . [or] unfair practice, or the concealment . . . of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce . . . is declared to be an unlawful practice."  Mo. Rev. Stat. § 407.020.1.

89.     The enabling regulations for the MMPA define an "unfair practice" as conduct that (1) offends public policy; (2) is unethical, oppressive, and unscrupulous; (3) causes a risk of substantial injury to consumers; (4) was not in good faith; (5) is unconscionable; or (6) is unlawful. *See* Mo. Code Regs. Ann. tit. 15, § 60-8.

90.     Under the MMPA, the term "merchandise" is broadly defined to include "any objects . . . or services."  Mo. Rev. Stat. § 407.020.4. The Class Vehicles are "merchandise" within the scope of the MMPA.

91.     The MMPA authorizes private causes of action, and class actions.  Mo. Rev. Stat. §§ 407.025.1; 407.025.2. Plaintiffs and members of the proposed Class are individuals entitled to bring suit and recover under the MMPA.

92.     When Ford designed, developed, manufactured, marketed, and sold the Class Vehicles, it was involved in the conduct of trade and commerce under the MMPA.

93.     At the time Ford developed, manufactured, marketed, and sold the Class Vehicles, it knew or should have known that they contain oil pump defect alleged herein that posed serious safety risks to consumers like Plaintiffs and Class members.

94.     Nonetheless, Ford omitted and/or concealed its knowledge of the oil pump defect from consumers like Plaintiffs and Class members.

95.     The oil pump defect created and continues to create serious safety risks, which were hidden from the consumers.

96.     Ford omitted and/or concealed the unreasonable safety risks associated with the defective Class Vehicles that were material facts to consumers like Plaintiffs and Class members. No reasonable consumer would have knowingly bought or leased a Class Vehicle if that consumer had known it was manufactured and distributed with the oil pump defect.

97.     Despite this safety risk, Ford did not recall the defectively designed Class Vehicles, nor did it notify consumers that the engines in Class Vehicles could prematurely fail because of the oil pump defect.

98.     Ford also failed to notify consumers about the safety risks associated with the oil pump defect and the corresponding engine failure.

99.     Ford's intentional misrepresentations, omissions and concealments of material fact constitute unfair and/or deceptive practices in violation of the MMPA. Ford's violations of the

MMPA were designed to conceal, and Ford failed to disclose material facts about the oil pump defect and the unreasonable safety risks of the Class Vehicles in order to induce Plaintiffs and the Class members to purchase Class Vehicles and to avoid the cost of recalling, replacing, repairing or retrofitting the Class Vehicles.

100. Plaintiffs and Class members suffered injury-in-fact as a direct result of Ford's violations of the MMPA in that they have purchased or leased Class Vehicles that pose an immediate safety risk and will have to be repaired or replaced.

101. Plaintiffs and Class members have also been denied the use of their Class Vehicles, expended money on replacements, repairs, and damages to their Class Vehicles and suffered as a result of Ford's conduct.

102. To this day, Ford continues to violate the MMPA by concealing the defective nature of the Class Vehicles by failing to issue a recall, by failing to notify customers of the serious safety issues posed by the oil pump defect, and by failing to offer cost-free repair or replacement of the defective Class Vehicles to consumers.

103. As a direct and proximate result of Ford's unfair acts or practices alleged herein, Plaintiffs and the Class members were damaged.

## COUNT II
## Unjust Enrichment
### (Brought by Plaintiffs and on behalf of the Class)

104. Plaintiffs, on behalf of themselves and the proposed Class, hereby re-allege the paragraphs above as if fully set forth herein.

105. Ford knew or should have known of the oil pump defect and the serious safety risks it poses, which it failed to disclose to Plaintiffs and the Class Members.

106.     As a result of its wrongful and fraudulent acts and omissions, as set forth above, pertaining to the oil pump defect in the Class Vehicles and the concealment of the it, Ford obtained monies that rightfully belong to Plaintiffs and Class members to the detriment of the Plaintiffs and Class members.

107.     Ford appreciated, accepted and retained the non-gratuitous benefits (i.e. profits) conferred by Plaintiffs and Class members who had no knowledge of the oil pump defect. Plaintiffs and Class members either paid a higher price for their Class Vehicles which actually had lower values, or paid Ford monies for Class Vehicles that Plaintiffs and Class Members would not have purchased had they been aware of the oil pump defect.

108.     It would be inequitable and unjust for Ford to retain these wrongfully obtained profits.

109.     Ford's retention of these wrongfully obtained profits would violate the fundamental principles of justice, equity, and good conscience.

110.     Plaintiffs and the Class are entitled to restitution of the profits unjustly obtained, plus interest.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request that the Court enter a judgment awarding the following relief:

    a.  An order certifying the proposed Class and appointing Plaintiffs and their counsel to represent the Class;

    b.  An order awarding Plaintiffs and Class members their actual damages, and/or any other form of monetary relief provided by and pursuant law;

c. An order awarding Plaintiffs and the Class restitution, disgorgement or other equitable relief as the Court deems proper;

d. An order requiring Ford to adequately disclose and repair the oil pump defect;

e. An order awarding Plaintiffs and the Class pre-judgment and post-judgment interest as allowed under the law; and

f. An order awarding Plaintiffs and the Class reasonable attorneys' fees and costs of suit, including expert witness fees.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all claims so triable.

DATED: November 2, 2023    Respectfully submitted,

**WILLIAMS DIRKS DAMERON LLC**

_____*/s/ Matthew L. Dameron*_____
Michael A. Williams (MO Bar No. 47538)
Matthew L. Dameron (MO Bar No. 52093)
1100 Main Street, Suite 2600
Kansas City, Missouri 64105
Telephone: (816) 945-7135
mwilliams@williamsdirks.com
matt@williamsdirks.com

*Attorneys for Plaintiffs and the Proposed Class*